FILED
2015 Mar-30 PM 03:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICY COURT**
**FOR THE MORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| *ex rel.* **JIMMY TEMPLE** | ) | |
| | ) | |
| **Relator,** | ) | |
| | ) | **Civil No.: 2:12-cv-1119-MHH** |
| **v.** | ) | |
| | ) | |
| **SIGMATECH, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Defendant Sigmatech, Inc. provides systems engineering and technical assistance services to the U.S. Army through a subcontract with Computer Sciences Corporation (CSC). Relator Jimmy Temple worked as a technical director for Sigmatech from February 2010 until Sigmatech terminated his employment on November 15, 2011. Mr. Temple brings this action as a *qui tam* relator on behalf of the United States. He alleges that Sigmatech illegally billed CSC for work done on unfunded projects, causing CSC to submit false claims to the United States in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A). Mr. Temple also states a claim for retaliatory discharge under § 3730 of the False Claims Act, alleging that Sigmatech terminated his employment after he

investigated and disclosed Sigmatech's billing practices and the public health threat posed by Sigmatech's electromagnetic environmental effects (E3) facility.

Sigmatech moves to dismiss Mr. Temple's complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. Sigmatech asserts that Mr. Temple's False Claims Act (FCA) claim must fail because (1) Mr. Temple cannot establish that Sigmatech knowingly submitted false claims to the Government; (2) Mr. Temple does not state his claims with the particularity required by Rule 9(b); and (3) Mr. Temple cannot state a claim for conduct that pre-dates Congress's May 20, 2009 amendments to the FCA. Sigmatech also argues that Mr. Temple's retaliation claim should be dismissed to the extent that it relies on allegations connected to the E3 facility because Mr. Temple does not identify a potential false claim in connection with the E3 facility.

For the reasons stated below, the Court denies Sigmatech's motion to dismiss Mr. Temple's FCA claim. The Court grants Sigmatech's motion to dismiss Mr. Temple's retaliation claim to the extent that it relies on allegations concerning the E3 facility.

## I.    STANDARD OF REVIEW

Rule 12(b)(6) enables a defendant to move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Pursuant to Rule 8(a)(2), a complaint must contain, "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Generally, to survive a [Rule 12(b)(6) motion to dismiss and meet the requirement of Fed. R. Civ. P. 8(a)(2), a complaint need not contain 'detailed factual allegations,' but rather 'only enough facts to state a claim to relief that is plausible on its face.'" *Maledy v. City of Enterprise*, 2012 WL 1028176, at *1 (M.D. Ala. Mar. 26, 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555).

"In an action under the False Claims Act, Rule 8's pleading standard is supplemented but not supplanted by Federal Rule of Civil Procedure 9(b)." *Urquilla-Diaz v. Kaplan University*, 2015 WL 1037084, at *9 (11th Cir. March 11, 2015). The relator "'must state with particularity the circumstances constituting fraud' but may allege scienter generally." *Id.* (quoting *Cooper v. Blue Cross and Blue Shield*, 19 F.3d 562, 567–68 (11th Cir. 1994)). To satisfy this heightened pleading standard, "the complaint must set forth 'facts as to time, place and substance of the defendant's alleged fraud' and 'the details of the [defendant's] allegedly fraudulent acts, when they occurred, and who engaged in them." *United States ex rel. Keeler v. Eisai, Inc.*, 568 Fed. Appx. 783, 793 (11th Cir. 2014)

(quoting *United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002)).

In deciding a Rule 12(b)(6) motion to dismiss, a court must view the allegations in a complaint in the light most favorable to the non-moving party. *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295 (11th Cir. 2007). A court must accept well-pled facts as true. *Grossman v. Nationsbank*, *N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000).

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties

Sigmatech, Inc. is an Alabama corporation headquartered in Huntsville, Alabama. (Doc. 1, ¶ 25). Sigmatech provides systems engineering and technical assistance services to the U.S. Army Aviation and Missile Research, Development and Engineering Center (AMRDEC) at the Spectrum Management Office at Redstone Arsenal. (Doc. 1, ¶ 29). Although Sigmatech provides services to the Army, Sigmatech does not contract directly with the Army. Instead, Sigmatech has a subcontract with Computer Sciences Corporation (CSC), an organization that contracts directly with the Army. (Doc. 1, ¶¶ 34, 35).

CSC, a Nevada corporation with an office in Athens, Alabama, provides technology-enabled business solutions to government and private sector clients. (Doc. 1, ¶¶ 30, 31, 33). The FCA claim in this matter pertains to Army Contract

4

number W41P4Q-05-A-0028,[1] a blanket purchase agreement between the United States Army and CSC. (Doc. 1, ¶ 35). In a blanket purchase agreement, the value of the contract changes based on evolving tasks and delivery orders. (Doc. 1, ¶ 36). In April 2012, the value of the blanket purchase agreement between the Army and CSC was approximately $556 million. (Doc. 1, ¶ 36).

Mr. Temple began working for Sigmatech in February 2010 as a technical director in the Spectrum Management Office. (Doc. 1, ¶¶ 16–17). Mr. Temple performed work for Sigmatech under Sigmatech's subcontract with CSC. (Doc. 1, ¶ 34). Willie Albanes, from the Weapons Development and Integration Directorate (WDI), was the government lead for the Spectrum Management Office during Mr. Temple's employment. (Doc. 1, ¶ 41). Sigmatech instructed Mr. Temple "to take all direction from Mr. Albanes." (Doc. 1, ¶ 41).

## B.   Sigmatech's Billing Practices

At the beginning of Mr. Temple's employment with Sigmatech, Mr. Temple noticed that Sigmatech employees were working for government programs and offices that did not have contracts with Sigmatech or WDI. (Doc. 1, ¶¶ 42–43). Sigmatech employees would then charge government programs and offices for support that was not provided to the government customer's office. (Doc. 1, ¶ 44).

---

[1] Mr. Temple also refers to a "CSC Express contract" which is assigned the contract number W31P4Q-05-A-0028. (Doc. 1, ¶¶ 2, 65). The Court cannot determine from the pleadings whether this is a typo or whether Mr. Temple is making allegations regarding two different contracts. For the purposes of the motion to dismiss, the Court will assume that all of Mr. Temple's allegations relate to the same contract between CSC and the Army.

Mr. Temple expressed concern over this billing practice to longtime Sigmatech employee Eugene Dickerson, who was designated as Mr. Temple's Sigmatech support.  (Doc. 1, ¶ 45).  Mr. Dickerson informed Mr. Temple that Sigmatech employees had always filled out timecards in this manner.  (Doc. 1, ¶ 45).

In or around March 2010, Mr. Temple asked Mr. Albanes how to charge government customers that were not funded.  (Doc. 1, ¶ 46).  Mr. Albanes informed Mr. Temple that it was illegal to work for unfunded government programs unless Mr. Albanes expressly directed Mr. Temple to perform the work.  (Doc. 1, ¶ 47).  Mr. Albanes also instructed the Spectrum Management Office to inform government customers that although working on unfunded government programs was illegal, the Spectrum Management Office could begin work on an unfunded project with Mr. Albanes's approval.  (Doc. 1, ¶ 48).

In or around June 2010, Mr. Temple hired Eric Melville.  (Doc. 1, ¶ 52).  Shortly after beginning work, Mr. Melville expressed concern about Sigmatech's billing practice of charging funded customers for work being performed for unfunded customers.  (Doc. 1, ¶ 53).  Mr. Temple decided to confirm this billing practice with Larry Jess, Sigmatech's CIO.  (Doc. 1, ¶ 55).  Mr. Jess told Mr. Temple that the billing practice was legal and described the action as "[r]obbing Peter to pay Paul."  (Doc. 1, ¶ 56).  Mr. Jess also stated that Mr. Albanes "was the

customer" and that Sigmatech would "provide support at Albanes' direction." (Doc. 1, ¶ 57).

Mr. Temple alleges that he directly observed Sigmatech and Albanes use funds from funded government projects to pay for unfunded government projects. (Doc. 1, ¶ 61). When funds from a funded government project depleted, Sigmatech used the blanket-purchase-agreement element of the Army's contract with CSC to request more funds from the Government. (Doc. 1, ¶ 62). Sigmatech could have worked on unfunded projects by securing a memorandum of agreement between the unfunded project and a related, funded project. (Doc. 1, ¶¶ 50, 69). Mr. Temple maintains that Sigmatech never secured an MOA. (Doc. 1, ¶ 69).

In his complaint, Mr. Temple gives several examples of this conduct. In November of 2010, Mr. Temple e-mailed Chris Hammer at the WDI directorate and informed Mr. Hammer that the Spectrum office did not have sufficient funds to continue supporting the Precision Pulse Positioning Systems program (3PS). (Doc. 1, ¶ 58). Mr. Hammer e-mailed Mr. Albanes and requested funding from a different government program, "EAPS," to continue funding 3PS. (Doc. 1, ¶ 59). Mr. Albanes agreed to fund the 3PS program with funds from EAPS, stating that "when we run out of funds for EAPS frequency management we will ask for more." (Doc. 1, ¶ 60).

According to Mr. Temple's complaint, in October 2010, Mr. Albanes stated in an e-mail that he would use funds from WDI's CSC Express contract to continue work on the unfunded Frequency Management RAID project. (Doc. 1, ¶ 65). In December 2010, Mr. Albanes diverted funds from the WDI CSC Express contract to fund the Apache Longbow Project. (Doc 1, ¶ 66; Doc. 31, p. 31). In January 2011, Mr. Albanes authorized funds from the WDI CSC Express contract to be used for the unfunded Frequency Management TOC-C2 Harbormaster project. (Doc. 1, ¶ 67).

Mr. Temple alleges that in October 2011, a government customer told Mr. Temple that Mr. Temple could not begin working on a project until the project was funded. (Doc. 1, ¶ 70). As a result of this conversation, Mr. Temple decided to speak with Phil Jenkins, WDI branch Chief and Albanes' superior, about Sigmatech's billing practices. (Doc. 1, ¶¶ 71, 72). When Mr. Temple described Sigmatech's billing practices, Mr. Jenkins informed Mr. Temple that the practices were a "misappropriation of funds, illegal, and come[] with a possible jail sentence." (Doc. 1, ¶ 73). Mr. Temple subsequently informed all Spectrum office managers to stop working for unfunded programs and to not charge funded customers for work supporting unfunded customers. (Doc. 1, ¶¶ 74, 75). On November 15, 2011, Sigmatech terminated Mr. Temple's employment. (Doc. 1, ¶ 121).

C.      **The Electromagnetic Environmental Effects (E3) Facility**

Mr. Temple contends that during his employment at the Spectrum office, he also discovered that Redstone's Electromagnetic Environmental Effects (E3) facility did not have an operating license.  (Doc. 1, ¶¶ 92, 99).  The Department of Defense created the E3 program to assess potential threats posed to military capabilities by concentrated radio waves.  (Doc. 1, ¶ 90).  At the E3 facility, the Army would shoot radiation at vehicles, such as Blackhawk helicopters and Humvees, and observe the effects.  (Doc. 1, ¶ 97).

After he discovered that the E3 facility did not have a license, Mr. Temple alleges that Mr. Albanes told E3 officials that Spectrum did not intend to shut down the E3 facility.  (Doc. 1, ¶ 101).  Albanes demanded that Mr. Temple provide the licensing and certification process to E3.  (Doc. 1, ¶ 102).  Certification involves an inspection that ensures the equipment is operating within the frequency parameters established by the Department of Defense, as well as state and federal laws.  (Doc. 1, ¶ 103).  In September 2011, when Mr. Temple inspected the E3 equipment for the licensing and certification process, Mr. Temple discovered that the E3 facility was operating illegally.  (Doc. 1, ¶ 105).  Mr. Temple asserts that he found that E3's beam antenna, which created a focused beam of non-ionizing radiation, was focused at Lacey's Spring, Alabama.  (Doc. 1, ¶¶ 107–109).  According to Mr. Temple's complaint, non-ionizing radiation has been causally

9

linked to Leukemia.  (Doc. 1, ¶ 110).  Mr. Temple also found that the beam antenna's frequency range exceeded the authority given to E3 by the National Telecommunications and Information Administration.  (Doc. 1, ¶ 115).  Mr. Temple alleges that a beam that is operating on the wrong frequency at the wrong time can impede electronic instruments, which could cause an accident such as an airplane crash.  (Doc. 1, ¶ 113).

As a result of his investigation, Mr. Temple could not issue a license or certificate to E3.  (Doc. 1, ¶ 115).  In October and early November 2011, Mr. Temple stressed to Mr. Jess and Mr. Albanes that E3's operation was illegal and posed a threat to public health and safety.  (Doc. 1, ¶¶ 118–120).  This is the same time period in which Mr. Temple told Spectrum managers to stop billing funded programs for work done on unfunded programs.  (Doc. 1, ¶¶ 70, 74, 75).  On November 15, 2011, Sigmatech terminated Mr. Temple's employment.  (Doc. 1, ¶ 121).

D.   **Procedural Background**

On April 17, 2012, Mr. Temple brought this action under seal as a *qui tam* relator on behalf of the United States.  (Doc. 1).  In his complaint, Mr. Temple alleges claims for violation of the False Claims Act, 31 U.S.C. § 3729, and for retaliatory discharge under the False Claims Act, 31 U.S.C. § 3730.  (Doc. 1, pp. 17, 18).  On May 10, 2013, the United States declined to intervene in this action.

(Doc. 17).   Sigmatech subsequently moved to dismiss the complaint pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.   (Doc. 28).   The parties fully briefed the motion.   (Docs. 31, 32).   On this record, the Court considers Sigmatech's motion to dismiss.

## III.   ANALYSIS

### A.   Mr. Temple's FCA Claim

The False Claims Act imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."   31 U.S.C. § 3729(a)(1)(A).   The term "knowingly" means that the person has "actual knowledge of the information; acts in deliberate ignorance of the truth or falsity of the information; or acts in reckless disregard of the truth or falsity of the information."   31 U.S.C. § 3729(b)(1).   The FCA's definition of a "claim" includes any request or demand for money that "is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government provides or has provided any portion of the money or property requested or demanded."   31 U.S.C. § 3729(b)(2)(A)(ii).

In the complaint, Mr. Temple alleges that "every report, invoice, and payroll record that Sigmatech submitted to CSC was false.   In turn, every claim for payment CSC presented to the Government associated with Army Contract

11

W41P4Q-05-A-0028 was false."   (Doc. 1, ¶ 84).   Mr. Temple explains that "Sigmatech submitted claims for payment to CSC based on the timecards submitted by Jimmy Temple and other members of the Spectrum Management Office.  These time cards billed CSC for work on projects that the government did not fund.  The government paid CSC for these claims."   (Doc. 1, ¶ 127).   In support, Mr. Temple provides examples of times when Sigmatech employees worked on unfunded projects and billed that work to CSC.  (Doc. 1, ¶¶ 65–68). Finally, Mr. Temple alleges that Sigmatech "knew . . . , or as an experienced contractor, should have known this was illegal."   (Doc. 1, ¶ 88).   Under Federal Rule of Civil Procedure 9(b), knowledge "may be alleged generally."   Therefore, Mr. Temple has stated a prima facie case that Sigmatech knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval.

## 1.      12(b)(6)

Sigmatech moves to dismiss Mr. Temple's FCA claim under Rule 12(b)(6) for failure to state a claim.  Sigmatech asserts that Mr. Temple cannot show that Sigmatech "knowingly" presented a false claim because Sigmatech acted at the direction of Army contracting officer Willie Albanes.  (Doc. 29, p. 5).  In other words, Sigmatech asserts that "[w]here the government has complete advance knowledge of the alleged false claim, the defendant has not acted with the requisite scienter."  (Doc. 29, p. 6).

Sigmatech is essentially trying to rebut Mr. Temple's allegations that Sigmatech knowingly presented a false claim by showing that the Government also had knowledge of the claim. "However a rebuttal, while possibly creating a subsequent factual dispute, is not relevant to the question of whether [Mr. Temple] has adequately stated a claim." *United States ex rel. Sanchez v. Abuabara*, 2012 WL 254764, at *11 (S.D. Fla. Jan. 27, 2012). Under Federal Rule of Civil Procedure 9(b), knowledge "may be alleged generally." Mr. Temple has alleged that Sigmatech "knew . . . , or as an experienced contractor, should have known" that its billing practices were illegal. (Doc. 1, ¶ 88). Because Mr. Temple has stated a prima facie case under the false claims act, Sigmatech's efforts to rebut Mr. Temple's allegations of knowledge are better suited for a motion for summary judgment.

Sigmatech cites two cases in which courts outside this circuit granted a defendant's motion to dismiss on the basis of complete government knowledge of the false claim: *United States ex rel. Stierli v. Shasta Services, Inc.*, 440 F. Supp. 2d 1108 (E.D. Cal. 2006) and *Gonzalez v. Planned Parenthood of Los Angeles*, 759 F.3d 1112 (9th Cir. 2014). *Shasta* and *Gonzalez* are distinguishable. In *Shasta*, the district court granted defendant's motion to dismiss because the Government had "full knowledge" of the defendant's alleged noncompliance and still chose to award the contract in question to the defendant. 440 F. Supp. 2d at

1114. Similarly, in *Gonzalez*, the Government was fully aware of the alleged false claim. The plaintiff in *Gonzalez* attached letters to his complaint in which the Government expressed concern over defendant's billing practices, but the Government remained silent when the defendant explicitly described its billing practices. 759 F.3d at 1115. The Government later admitted in a letter that "conflicting, unclear, or ambiguous misrepresentations have been made to providers" about proper billing practices. *Id.* The court granted the motion to dismiss in light of the Government's "explicit statements" addressing billing and the Government's silence after the defendant described its billing practices. *Id.* at 1116.

In the instant case, the facts alleged in the complaint, viewed in the light most favorable to Mr. Temple, show that the Government did not have "full knowledge" of Sigmatech's billing practices. When Mr. Temple described Sigmatech's billing practices to Phil Jenkins, WDI Branch Chief and Albanes' superior, Mr. Jenkins stated that the billing practices were a "misappropriation of funds, illegal, and come[] with a possible jail sentence." (Doc. 1, ¶¶ 71–73). Thus, this case is more like *United States v. Kellogg Brown & Root Services, Inc.*, 800 F. Supp. 2d 143 (D.D.C. 2011), in which the district court denied the defendant's motion to dismiss. In *Kellogg*, the defendant alleged that the Government paid claims that it knew contained unallowable costs, but the Government contended

14

that it rejected the allegedly false claims as soon as it recognized that the claims contained unallowable costs.  800 F. Supp. 2d at 159–60.  The *Kellogg* court stated, "[f]aced with competing factual claims, neither inherently more credible than the other, the Court must draw the inferences in the non-moving party's favor."  *Id.*  Because there are competing factual claims in this case regarding the extent of the Government's knowledge of the alleged false claim, the Court denies Sigmatech's motion to dismiss for failure to state a claim.

### 2.    Rule 9(b)

Sigmatech asks the Court to dismiss this action pursuant to Rule 9(b) because Mr. Temple "does not allege the existence of even one demand made to the government."  (Doc. 29, pp. 12–13).  As discussed above, the FCA does not require Mr. Temple to allege presentment of false claims directly to the Government.  *See* 31 U.S.C. § 3729(b)(2)(A)(ii) (defining a claim as "any request or demand" for payment "made to a contractor" if the Government "has provided any portion of the money or property requested or demanded").  Significantly, Sigmatech admits that "[i]n detailing the Government officers' alleged diversion of funds and Sigmatech's alleged submission of timesheets to CSC, Mr. Temple has endeavored to allege the who, what, where, when and how of improper practices." (Doc. 20, p. 14).  Because these allegations satisfy the requirements of Rule 9(b) in an FCA action, the Court denies Sigmatech's motion to dismiss under Rule 9(b).

### 3.    Mr. Temple's Pre-FERA FCA Claims

Sigmatech's final argument for dismissing Mr. Temple's FCA claim is that Mr. Temple cannot state a claim for conduct that pre-dates Congress's May 20, 2009 amendments to the FCA. (Doc. 32, pp. 8–9). In 2009, Congress enacted the Fraud Enforcement and Recovery Act of 2009 ("FERA"), which amended and renumbered the FCA. Pub. L. No. 111–21, 123 Stat. 1617 (2009). Prior to FERA, the FCA imposed liability on any person who "(1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval" or "(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)–(2). Section 3729(a)(1) required "proof that a false claim was presented to the Government," while § 3729(a)(2) included situations in which a "subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim." *Allison Engine Co., Inc. v. U.S. ex rel. Sanders*, 553 U.S. 662, 668–71 (2008).

Mr. Temple alleges that Sigmatech, a subcontractor, submitted false bills to a prime contractor, CSC, intending that CSC use those bills to get the Government to pay its claim. (Doc. 1, ¶¶ 84–85). This conduct fits squarely within the pre-FERA § 3729(a)(2). Sigmatech points out that Mr. Temple's complaint "purports

16

to raise claims only under 31 U.S.C. § 3729(a)(1)(A)," which was previously codified at § 3729(a)(1).  (Doc. 36, pp. 2, 3).  However, "the form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim.  *Keene v. Prine*, 477 Fed. Appx. 575, 583 (11th Cir. 2012).   Therefore, the Court denies Sigmatech's motion to dismiss Mr. Temple's pre-FERA allegations.

## B.   Mr. Temple's Retaliatory Termination Claim

To state an action under the retaliation provisions of the FCA, Mr. Temple must show that (1) Sigmatech is covered by the act at issue, (2) Mr. Temple engaged in protected activity, (3) Mr. Temple suffered an adverse action, and (4) there is an inference of causation between the protected activity and the adverse action.  *Mann v. Olsten Certified Healthcare Corp.*, 49 F. Supp. 2d 1307, 1317 (M.D. Ala. 1999) (citing *Bechtel Constr. Co. v. Secretary of Labor*, 50 F.3d 926, 934 (11th Cir. 1995)).[2]  An action is "protected activity" under the FCA if the action is taken "in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]."  31 U.S.C. § 3730(h)(1).  In other words, Mr. Temple's alleged actions must be "sufficient to support a reasonable conclusion

[2] The Court uses the four-element test set forth in *Mann*, which has been cited favorably by the Eleventh Circuit.  *See U.S. ex rel. Sanches v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010); *Mack v. Augusta-Richmond Cnty., Ga.*, 148 Fed. Appx. 894, 897 (11th Cir. 2005) (unpublished).  Other circuits use similar prima facie tests comprised of only two or three elements.  *See Hutching v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (applying a two-element test); *McKenzie v. BellSouth Telecomm., Inc.*, 219 F.3d 508, 514 (6th Cir. 2000) (applying a three-element test).

that [Sigmatech] could have feared being reported to the government for fraud or sued in a *qui tam* action by [Mr. Temple]." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010).

Mr. Temple's allegations regarding the E3 facility cannot form the basis for a retaliation claim because the E3 allegations do not have any nexus with a false claim. Mr. Temple has not alleged that Sigmatech made false records or statements in connection with the E3 facility, or that the Government made expenditures in connection with the E3 facility. (Doc. 29, p. 16; *see* Doc. 1, pp. 14–19). Mr. Temple does not challenge this contention in his response in opposition to Sigmatech's motion. (Doc. 31, pp. 15–19). Therefore, the Court dismisses Mr. Temple's retaliation claim to the extent that it relies on Mr. Temple's allegations concerning the E3 facility.

Mr. Temple's retaliation claim also rests on his disclosures regarding Sigmatech's billing practices. (Doc. 1, ¶¶ 133–34). In its reply, Sigmatech states that it "has not moved to dismiss [Mr. Temple's] retaliation claim to the extent it relies on his allegations of improper billing." (Doc. 32, p. 9 n. 5). Therefore, Mr. Temple's retaliation claim based on his disclosure of Sigmatech's billing practices will move forward.

## IV.   CONCLUSION

For the reasons stated above, the Court **DENIES** Sigmatech's motion to dismiss Mr. Temple's FCA claim.  The Court **GRANTS** Sigmatech's motion to dismiss Mr. Temple's retaliation claim to the extent that it rests on Mr. Temple's allegations concerning the E3 facility.  Mr. Temple's retaliation claim based on his disclosure of Sigmatech's billing practices will move forward.

The Court directs the Clerk to please **TERM** Doc. 28.

**DONE** and **ORDERED** this March 30, 2015.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE